DAVID L. JORDAN (SBN 203457)
dljordan@grsm.com
EDWARD ROMERO (SBN 148495)
eromero@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 875-3323
Facsimile: (415) 986-8054

Attorneys for Plaintiff and Counter-Defendant
GOOD TIMES RESTAURANTS, LLC and
Third Party Defendants
VIKRAM BHAMBRI, ANUPAMA BHAMBRI;
TARESH ANAND; JATINDER PAL SINGH KOHLI;
And SACHIN DHAWAN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOOD TIMES RESTAURANTS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> SHINDIG HOSPITALITY GROUP LLC, an Illinois limited liability company; and DOES 1-10, <br><br> Defendant. | **Case No. 3:21-cv-07688 AGT** <br><br> **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COUNTERCLAIM AND AMENDED THIRD PARTY COMPLAINT** <br><br> Date: June 24, 2022 <br> Time: 10:00 a.m. <br> Courtroom: A, 15th Floor <br> [The Honorable Alex G. Tse] |
| SHINDIG HOSPITALITY GROUP LLC, an Illinois limited liability company <br><br> Counter-Plaintiff, <br><br> v. <br><br> GOOD TIMES RESTAURANTS, LLC, a California limited liability company, <br><br> Counter-Defendant, | |
| SHINDIG HOSPITALITY GROUP, LLC, an ILLINOIS limited liability company, <br><br> Third-Party Plaintiff, | |

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

1        v. )
2  )
 VIKRAM BHAMBRI; ANUPAMA )
3   BHAMBRI; TARESH ANAND; )
 JATINDER PAL SINGH KOHLI; SACHIN )
4   DHAWAN; and ROES 1 - 20, )
)
5       Third Party Defendants. )

**Gordon Rees Scully Mansukhani, LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

# TABLE OF CONTENTS

Page

1. The Consulting Agreement is Not a Franchise Agreement under California Law. .............................................................................................................. 1

    A. The Consulting Agreement Does Not Grant Shindig The Right to Engage in a Business. ................................................................. 2

    B. Shindig Has Not Paid Good Times for the Right to Enter into a Business. ........................................................................................... 3

    C. The License Fee is not a Franchise Fee. ....................................... 4

    D. There is No Express or Implied Marketing Plan or System Prescribed by Good Times. ........................................................... 6

2. The Consulting Agreement is Not a Franchise Agreement under Illinois Law ................................................................................................................ 10

3. The Consulting Agreement Does Not Meet the FTC Franchise Rule for a Franchise Agreement. .................................................................................. 13

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S.C 662 (2009) .................................................................................................. 15

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................... 15

*Broberg v. Guardian Life Insurance,*
  171 Cal. App. 4th 912 (2009) ..................................................................................... 15

*Chicago Male Medical Clinic v. Ultimate Management, Inc.*,
  2014 WL 7180549 (C.D. Cal. Dec. 16, 2014) ................................................. 10, 11, 12

*Gentis v.Safeguard Business Systems,*
  60 Cal. App. 4th 1294 (1998) ........................................................................................ 3

*Kim v. Servosnas, Inc.*,
  10 Cal. App. 4th 1346 (1992) ........................................................................................ 3

*People v. Kline*,
  110 Cal. App. 3d 587 (1980) ............................................................................ 7, 8, 9, 10

*Salkeld v. V.R. Business Brokers*,
  192 Ill. App. 3d 663 .................................................................................................... 12

*Thueson v. U-Haul International, Inc.*,
  144 Cal. App. 4th 664 (1994) ............................................................................. 2, 3, 4, 5

**Statutes**

Business & Profession Code
  Section 17200 ............................................................................................................. 13

California Business and Professions Code
  Section 10030 ............................................................................................................... 8

Corporations Code
  Section 31005 ............................................................................................................ 1, 2

**Rules**

Federal Rules of Civil Procedure
  Rule 8 ......................................................................................................................... 15

**Regulations**

16 Code of Federal Regulations
  Section 436 .................................................................................................................. 1

*Gordon Rees Scully Mansukhani, LLP*
*275 Battery Street, Suite 2000*
*San Francisco, CA 94111*

16 Code of Federal Regulations
    Section 436.1 .................................................................................................................. 14

16 Code of Federal Regulations
    Section 436.2 .................................................................................................................. 13

44 Code of Federal Regulations
    Section 49967 ................................................................................................................. 13

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Nowhere does the Amended Pleading at issue allege that Shindig paid a franchise fee to Good Times. In the absence of the payment of such a fee, Shindig has no credible basis to contend that the Consulting Agreement alleged in the Amended Pleading is a franchise agreement. See Corporations Code section 31005 (a)(3); Ill Code section 705/3 section 3(1)(c); 16 C.F.R §436.1(h)(3).

Not only has Shindig failed to pay the requisite fees, the terms of the Consulting Agreement and case law and the opinions of the California Corporations Commissioner and the Federal Trade Commission make clear that the Consulting Agreement is not a franchise agreement because it does grant Shindig the right to engage in the business of offering, selling or distributing goods or services. Nor does the Consulting Agreement constitute a marking plan or system because, inter alia, Good Times exercises no control over Shindig whose manager, Manish Mallick controls at least 60% of Shindig. Good Times therefore respectfully requests that its motion to dismiss the Amended Pleading be granted.

**1. The Consulting Agreement is Not a Franchise Agreement under California Law.**

Shindig's attempt to characterize the Consulting Agreement between it and Good Times as a franchise agreement is without merit. The Consulting Agreement does not grant Shindig the right to engage in business which is a condition for an agreement to constitute a franchise agreement under California law. Nor are any of the monies owed by Shindig under the Consulting Agreement fees for the right to engage in a business. Similarly, there is no marketing plan prescribed in substantial part by Good Times which had no control over the conduct of Shindig whose managing member, Mallick, is alleged to have at least 60% control over Shindig. As such, the Consulting Agreement does not meet the elements of a franchise under the California Franchise Investment Law (the "CFIL") or the California Franchise Relations Act (the "CFRA").

-1-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

  A. *The Consulting Agreement Does Not Grant Shindig The Right to Engage in a Business.*

  Shindig's Opposition Memorandum fails to properly address an essential element necessary for the Consulting Agreement to constitute a franchise agreement: it must grant Shindig the right to engage in the business of offering, selling, or distributing goods or services. Cal. Corp. Code section 31005 (a)(1). The Consulting Agreement does not do so. Instead, it provide only that Good Times, will provide Shindig "with instruction, information and guidance related generally to the operation of a restaurant . . . ." Amended Pleading, Exhibit B at ¶1. Nowhere does the Consulting Agreement confer on Shindig the right to open or operate a business. Nor does Shindig's Amend Counterclaim and Amended Third Party Complaint (the "Amended Pleading") make any such allegation. The absence of a right to engage in business is detrimental to Shindig's claim that the Consulting Agreement is a franchise agreement. This point is made clear in the California Corporation Commissioner in Release 3-F (Release 3-F) cited in the Opposition Memorandum at 6:14 *et seq*. A copy of Release 3-F is attached as Exhibit 1 to the Declaration of Edward Romero in Support of Reply Memorandum to Motion to Dismiss the Amended Pleading (the "Romero Decl.").

  In Release 3-F, the Commissioner has since 1974 opined that that "[i]f t*he agreement does not grant the franchisee the right to engage in business, it is not a franchise.*" Romero Decl., Exhibit 1 at page 1, ¶2(1)(emphasis added). The Consulting Agreement does not grant Shindig any right to engage in business. Instead, it provides Shindig with an option to license some of Good Times' intellectual property but the license is optional and does not grant Shindig the right to engage in the business of offering, selling or distributing goods or services. See Cal. Corp. Code section 31005 (a). As such, the Consulting agreement is not a franchise agreement because it does not meet all of the elements required by section 31005a). *See Thueson v. U-Haul International, Inc.*, 144 Cal. App. 4th 664, 670 (1994) ("Only when all components are present can a franchise actually be found to exist."). This is consistent with the legislative intent of the

-2-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

1 CFIL and CFRA which is intended to protect those who pay for the right to enter into a
2 business. *See Thueson v. U-Haul International, Inc., supra*, at 673 (citing *Kim v.*
3 *Servosnas, Inc*., 10 Cal. App. 4th 1346, 1355-1356 (1992) and *Gentis v.Safeguard*
4 *Business Systems,* 60 Cal. App. 4th 1294, 1298 (1998).

5      B.     *Shindig Has Not Paid Good Times for the Right to Enter into a Business.*

6      The assertion that "Shindig agreed to pay significant and substantial fees to [Good
7 Times] in exchange for Plaintiffs' services, which permitted Shindig to enter into the
8 Rooh Restaurant business" fails to distinguish between the management fee and license
9 fees set for in the Consulting Agreement and the purposes for these fees. *See* Opposition
10 Memorandum at 8:10-12 and 8:27-9:2.

11      The management fee specified in section 3 of the Consulting Agreement (Exhibit
12 B to the Amended Pleading), is for the consulting services to be provided to Shindig.
13 Nowhere in the Consulting Agreement does Good Times confer Shindig with the right to
14 engage in the business of offering, selling or distributing good or services or the right to
15 open a restaurant. Rather, paragraph C of the Consulting Agreement makes clear that
16 Shindig "desires to retain the services of [Good Times] to consult with it on various
17 matters related to the establishment and operation of the Restaurant." In an attempt to
18 establish the element of the right to enter into a business, Shindig alleges that it was
19 forced by Good Times to use its executive chef and kitchen staff and employ
20 undocumented workers at the restaurant. *See* Amended Pleading, ¶52. Nowhere does the
21 Consulting Agreement, or any other agreement, impose a duty on Shindig to comply with
22 the alleged requests of Good Times and Shindig fails to cite to any such duty other than
23 to characterize them as "nonsensical. Opposition Memorandum at 12-13. The failure to
24 specify a duty under the Consulting Agreement pursuant to which Shindig opened its
25 restaurant makes clear that the agreement did not grant Shindig a right to enter into the
26 restaurant business.

27      In fact, the Amended Plead makes clear that it was Shindig that is alleged to have:
28

**Gordon Rees Scully Mansukhani, LLP**
**275 Battery Street, Suite 2000**
**San Francisco, CA 94111**

•identified and leased the commercial space in which the restaurant contemplated under the Consulting Agreement would be located. (Amended Pleading, ¶36);

•invested approximately $700,000.00 in the buildout and opening of the restaurant (Amended Pleading, ¶29);

•spent significant time, money and energy of its managing member, Manish Mallick, to prepare the property to operate as a bar and restaurant (Amended Pleading, ¶37) and

•Shindig was forced "to hire an experienced 'consultant' to learn how to operate a restaurant" and "design its own menu. (Amended Pleading, ¶55.)

Nowhere in the Amended Complaint, however, does Shindig allege that the Consulting Agreement conferred on Shindig the right to enter the restaurant business or to offer, sell or distribute goods and services. Nor is the management fee in the Consulting Agreement a franchise fee because it was not paid to allow Shindig the right to enter into a business. *See* Release 3-F at page 4, paragraph 4. As the Court in *Thueson v. U-Haul International, Inc.,* made clear:

> The law does not include in the definition of "franchise fee" payments which the franchisee *is not required to make but which are optional and required only if the franchisee elects to purchase, lease or rent merchandise, equipment or other property from the franchisor or an affiliate of the franchisor*"

*Thueson v. U-Haul International, Inc., supra*, at 676 (citing Release 3-F (the "Guidelines") at ¶4(g)). The management fee is therefore not a franchise fee and may not serve as a basis for the contention that the fee was paid to permit Shindig to enter into the Rooh restaurant business. *See* Opposition at 8:27-9:1.

    C.    *The License Fee is not a Franchise Fee.*

Unable to characterize the management fee as a franchise fee, Shindig resorts to claiming the license fee identified in paragraph 5 of the Consulting Agreement as a franchise fee. *See* Opposition Memorandum at 9:11-23. The license fee, however, is an optional fee that permits, but does not require, Shindig to use the intellectual property of Good Times. See Amended Pleading, Exhibit B at ¶5. As such, the license fee is not a

-4-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

franchise fee because it is not a fee for the right to enter into the restaurant business. *Thueson v. U-Haul International, Inc., supra*, at 676.

That the license fee is not a franchise fee is further made clear by Release 3-F. Under the section entitled "Required to Pay" the Commissioner opines that optional fees which a franchisee is not required to make are not franchise fees. As paragraph 7 of Release 3-F states:

> The Law does not include in the definition of "franchise fee" payments which the franchisee is not required to make but which are optional and required only if the franchisee elects to purchase, lease or rent merchandise, equipment or other property from the franchisor or an affiliate of the franchisor. *In the absence of an obligation or a condition in the franchise agreement compelling action on the franchisee's part, or the necessity for undertaking such obligation in order to successfully operate the business, voluntary payments are not "required" under the agreement and, therefore, are not included within the statutory definition of "franchise fee."*

Romero Decl., Exhibit 1 at page 4, ¶7 (emphasis added).

The Commissioner further opines in Release 3-F that while:

> voluntary payments, presumably, are not made for the right to enter into a franchised business and for that reason do not come within the definition. However, while a truly optional payment is not a franchise fee, a payment by a franchisee, though nominally optional, may in reality be essential; this is *especially so if the franchisor intimates or suggests that the payment is essential for the successful operation of the business.*

*Id*. (emphasis added).

Nowhere does the Consulting Agreement compel any action by Shindig. Nor does the Amended Complaint so allege. Additionally, the Consulting Agreement does not represent or suggest that payment of the license fee is essential for the successful operation of the Shindig restaurant. Indeed, the Amended Pleading does not allege any representation by either Good Times or its members that the license fee is essential for the successful operation of Shindig's restaurant. As such, there is no basis in fact or law for Shindig to contend that the license fee constitutes a franchise fee. In the absence of a franchise fee, Shindig is unable to credibly allege that the Consulting Agreement is a franchise agreement.

-5-

Case 3:21-cv-07688-AGT   Document 51   Filed 06/03/22   Page 11 of 20

### D. *There is No Express or Implied Marketing Plan or System Prescribed by Good Times.*

The absence of a marketing plan or system prescribed in substantial part by Good Times further dispels the contention that the Consulting Agreement is a franchise agreement. The Commissioner has opined that "[i]f no marketing plan or system is prescribed and the franchise is left entirely free to operate the business according to the franchisee's own marketing plan or system, the agreement is not a franchise." Romero Decl., Exhibit 1 at page 1, ¶2 (1); *see also* Cal. Corp. Code section 31005(a)(1) (franchise is a contract between two or more persons by which a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor).

Release 3-F further opines that the existence of a marketing plan or system is determined by the franchisor's control over the franchisees' operation, and consequently of a marketing plan prescribed by the franchisor. Romero Decl., Exhibit 1 at page 2, ¶2(3). As the Commissioner states:

> Significance attaches to provisions imposing a duty of observing the licensor's directions or obtaining the licensor's approval with respect to the selection of locations, the use of trade names, advertising, signs, sales pitches, and sources of supply, or concerning the appearance of the Licensee's business premises and the fixtures and equipment utilized therein, uniforms of employees, hours of operation, housekeeping, and similar decorations.
>
> The implementation of these and other similar directions by procedures for inspection by, and reporting to, *the franchisor with respect to the conduct of the franchised business, and the right of the franchisor to take corrective measures, possibly at the expense of the franchisees, are indicative of the franchisor's control over the franchisees' operations* and, consequently, of a marketing plan prescribed by the franchisor.

Romero Decl., Exhibit 1 at 2, ¶2(3)(emphasis added).

Control over the decision making process is a further indicia of a marketing plan. As Release 3-F states:

> [T]he *ability of the franchisor to control the essential decision making process of a franchisee's business, such as through a majority ownership interest in the business or by appointing a majority of the members of a committee* that is responsible for making important decisions relating to sales, marketing,

-6-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

merchandising, personnel, etc., is indicative of a marketing plan prescribed by the franchisor.

Romero Decl., Exhibit 1 at 2, ¶2 (3) (citing Comm. Op. Nos. 75/2F, 79/2F; OP 4736F)(emphasis added).

The Consulting Agreement presents none of the indicia of a marketing plan identified by the Commissioner. The Consulting Agreement does not impose requirements on Shindig to obtain Good Time's approval as to the selection of locations, the use of trade names, advertising, signs, sales pitches, and sources of supply, or concerning the appearance of the restaurant. Indeed, the Consulting Agreement does not even require Shindig to use any of Good Times' intellectual property.

Moreover, the Consulting Agreement does not require Shindig to report to Good Times about the conduct of the restaurant. Nor does the Consulting Agreement confer Good Times with the right to take corrective measures at the restaurant as the expense of Shindig.

Finally, Good Times has no ability to control the decision making process of Shindig. The managing member of Shindig, Manish Mallick, is alleged to own 60% of the company, which is the controlling interest in Shindig. Amended Pleading, Exhibit C at page 26, Schedule 4.1; Amended Pleading, ¶33. Moreover, the Consulting Agreement does not provide Good Times with the right to control any decision of Shindig. Indeed, Shindig is not required to agree or comply with any instruction, information or guidance provided by Good Times. This fact is made clear by the inability of Shindig to identify any provision in the Consulting Agreement which requires Shindig to hire undocumented workers or hire Good Times' chef and kitchen staff. See Amended Pleading, ¶¶42, 52.

Shindig's reliance on *People v. Kline*, 110 Cal. App. 3d 587, 591 (1980), for the proposition that there was an implied marketing plan between it and Good Times is disingenuous. *Kline* involved criminal defendant who appealed his misdemeanor conviction for unlawful offer and sale of securities and unlawful sale of a franchise. With respect to the franchise conviction, Appellant asserted that he sold two business

-7-

opportunities to a partnership that consisted of two individual investors and that business opportunities do not meet the statutory definition of a franchise because, inter alia, there was no marketing plan. *People v. Kline*, *supra*, at 592-593.

In affirming the conviction for the unlawful sale of a franchise, the Court of Appeal noted that the investors signed a partnership agreement drafted by Appellant in which an investor agreed to invest $50,000.00 to purchase at least two kiosks for Aunt Hilda's Pennsylvania Dutch Steamed Franks. Appellant represented that these kiosks would be sold as franchises. *People v. Kline* at 591. The two investors also signed, as partners, a "purchase agreement" drafted by Appellant in which the partnership would purchase to Aunt Hilda's Kiosks' Business Opportunities. *Id*. at 591-592. The Court of Appeal expressed its doubt that the sale of the kiosks were "business opportunities" because section 10030 of the California Business and Professions Code defines the term "as the sale or lease 'of the business and good will of an existing business enterprise or opportunity." *Kline, supra*, at 594, note 3.

Addressing Appellant's contention that the absence of a marketing plan precluded his conviction for unlawful sale of a franchise, the Court of Appeal noted that a marketing plan can be either expressed or implied. The Court, however, found that there was "ample evidence from which the trial court could find all of the statutory elements of a franchise." *Kline, supra*, at 594. The Court of Appeal also noted the trial court's conclusion that "the whole atmosphere around this sale clearly related to the sale of other than just the kiosk. It was a sale, actually, of a franchise." *Id*. In so doing, the Court of Appeal examined the written contract between Appellant's company, National Food Service Marketing, Inc., which served as the franchisor, and the partnership formed by the investors and which comprised the franchisee. *Id*. at 594-595.

The contract bound the franchisor "to 'total and continuing support' of the franchisee." *Kline, supra*, at 594. Appellant further orally agreed, through National Food Servicing Marketing, Inc. "to assist in advertising and to supply food and supplies and

-8-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

1 menu planning, etc., through his corporation." As a result, the Court of Appeal found

2 that:

> 3 4 5  The use of identifiable and distinctive kiosks at least implied a prescribed marketing plan or system, and there was an expressed agreement to sell "Aunt Hilda's Pennsylvania Dutch Steamed Franks," surely an indication of a common marketing plan or system. Appellant also promised that there would be an operational plan which he had 'pretty well worked out.'

6 *People v. Kline, supra*, at 594.

7 Appellant also represented to a number of people that he was organizing a

8 national food franchise similar to other well-known and successful national franchises.

9 *Kline* at 594. As a result, the Court of Appeal concluded that:

> 10 11 12  *the whole scheme was appellant's conception of an integrated operated prescribed and directed by him through National Food Service Marketing, Inc., his corporation.* By phrasing his handwritten agreement in terms of sale of a "business opportunity, appellant cannot avoid the requirement of registering this franchise sale.

13 *People v. Kline, supra*, at 594 (emphasis added).

14 The Court of Appeal therefore concluded that "[a] sale for a fee of a business

15 substantially associated with the seller's trademark, service mark, trade name, logotype,

16 advertising or other commercial symbol, *which the seller represents will constitute a*

17 *franchise and will include a marketing plan or system to be prescribed in substantial part*

18 *by the seller* is the unlawful sale of an unregistered franchise." *People v. Kline* at 595

19 (emphasis added).

20 Neither Good Times nor Vikram Bhambri sold or offered to sell anything to

21 Shindig. Rather, the Consulting Agreement addresses the consulting services to be

22 performed by Good Times and provides Shindig with the option to license some of Good

23 Times' intellectual property. The Consulting Agreement did not contain a marketing

24 plan or system for the Shindig restaurant. While the licensing portion of the Consulting

25 Agreement permits Shindig to use Good Times' "color scheme" and "look and feel," the

26 Consulting Agreement does not require Shindig to use Good Times' intellectual property.

27 Nor does the Consulting Agreement require Shindig to obtain approval from Good Time

28 as to the location of the restaurant, its use of trade names, advertising, signs, sales pitches,

-9-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

1  or sources of supply.  Nor does the Consulting Agreement does not require Shindig to
2  report to Good Times about the conduct of the restaurant.  Nor does the Consulting
3  Agreement confer Good Times with the right to take corrective measures at the restaurant
4  as the expense of Shindig.  Finally, the terms of the Consulting Agreement bear no
5  resemblance whatsoever to the facts in People v. Kline.  As such, there is no express or
6  implied marketing plan or scheme which is a material element of a franchise agreement
7  under both the CFIL and the CFRA which Shindig acknowledges are virtually identical.
8  *See* Opposition Memorandum at 9:26-10:1.

9  **2.      The Consulting Agreement is Not a Franchise Agreement under Illinois Law**

10       Shindig acknowledges that the Illinois Franchise Disclosure Act, ILL Rev. Stat.
11 1985 ch. 121 1/2, par. 701 *et seq*. (the "IFDA") is virtually identical to the CFIL and
12 CFRA.  Opposition Memorandum at 10:6-7.  Shindig's reliance on *Chicago Male*
13 *Medical Clinic v. Ultimate Management, Inc*., 2014 WL 7180549 (C.D. Cal. Dec. 16,
14 2014) is misplaced.  Plaintiff in *Chicago Male Medical Clinic* was an Illinois limited
15 liability company that had its principal place of business in Illinois.  *Id*. at *2.  Defendant
16 was a California Corporation with its principal place of business in California.  *Id*.  As
17 part of a consulting agreement between the parties, Plaintiff paid Defendant an initial fee
18 of $300,000.00 for the right to "engage in the National Male Medical Clinic business"
19 which consisted of erectile dysfunction and related medical services.  *Chicago Male*
20 *Medical Clinic, supra*, at *2-*3.  The initial fee also included time payment fees of 10
21 percent of the daily gross revenue of plaintiff's clinic operations.  *Id*.  As part of the
22 agreement, Defendant suggested a marketing plan which included "[t]elephone training
23 for incoming calls, suggested newspaper, magazine, circular, and radio ads, text for
24 effective window signing, information and aid in setting up toll free telephone numbers,
25 call center services, and other suggested marketing plans."  *Chicago Male Medical*
26 *Clinic, supra*, at *3, *7.

27
28

-10-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

Plaintiff brought a claim for violation of the IFDA seeking to rescind the agreement for failure to register the franchise with the State of Illinois or deliver a disclosure statement. *Chicago Male Medical Clinic, supra*, at *6.

The federal district court that heard the trial of the action found that the agreement was a franchise agreement because, inter alia, Plaintiff was required to pay a fee of more than $500.00 to Defendant for the right to engage in the National Male Medical Clinic business and because there was a marketing plan requiring Defendant in "conducting business." *Id*. at *6 and *8. In so doing, the district court noted that under the IFDA, a marketing plan is:

> a plan or system relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional material or cooperation in advertising efforts . . . .

*Chicago Male Medical Clinic, LLC, supra*, at *6 (citing 815 Ill Comp. Stat. 705/3(18)).

Here, Shindig did not purchase the right to enter the restaurant business or to offer, sell or distribute restaurant goods and services. Rather, the Consulting Agreement specified the services that Good Times would provide to Shindig as to an unspecified restaurant and the consideration to be paid by Good Times was for the performance of the consulting services. Additionally, the Consulting Agreement provided Shindig with right to license some of Good Times' intellectual property if Shindig so chose and set forth the consideration to be paid by Shindig for the use of such property. This is in contrast to the initial cash amount of $300,000.00 and 10 percent of daily gross revenues to be paid by Plaintiff in Chicago Male Medical Clinic for the right to enter the erectile dysfunction and related medical services.

With respect to a marketing plan, the Amended Pleading does not allege that Good Times provided Shindig with a plan or system relating to the specification of price or pricing system at the Shindig restaurant; use of particular sales or display equipment other than the license of certain intellectual property of Good Times. Nor does the Amended Pleading allege that Good Times provided Shindig with specific sales

-11-

techniques to be used at the restaurant or the use of advertising or promotional material or cooperation in advertising efforts with respect to the restaurant.  The facts of *Chicago Male Medical Clinic, LLC* are therefore distinguishable from those of this case.

*Salkeld v. V.R. Business Brokers*, 192 Ill. App. 3d 663 is similarly distinguishable. Plaintiff in *Salkeld* responded to an advertisement to sell and distribute a new product called Cocktails Naturally.  *Salkeld, supra*, at 1153.  Plaintiff paid approximately $22,500 for the right to sell the product.  *Id*. at 601.  When the venture did not work out, Plaintiff brought an action under the IFDA which the opinion refers to as the "Franchise Act."

In reversing the trial court's determination that Plaintiff had not entered into a franchise agreement, the Appellate Court of Illinois examined the definition of marketing plan under the IFDA which contained the same language as cited in *Chicago Male Medical Clinic, LLC, supr*a.  The Court in *Salkeld* found a marketing plan because

> Plaintiff was provided a copy of a sales manual detailing product information and sales strategies.  The manual stated how to demonstrate the product to potential customer [sic] and mix the drinks.  Furthermore, plaintiff was given a document describing the 'sub-license program' as a program in which the company is 'with you [plaintiff] every step of the way.'  The company promised support in marketing, training, advertising and promotion.

*Salkeld v. V.R. Business Brokers, supra,* at 599.

Unlike the representations by the franchisor in Salked, Good Times did not promise to support to Shindig in the operation of a franchise.  Rather, the Consulting Agreement provides that Good Times would be consulted on various matters related to the establishment and operation of a restaurant.  The consultancy contemplated by the Consulting Agreement is therefore collaborative.  Good Times had no role in the conduct undertaken by Shindig at its restaurant nor did Good Times have the right to take corrective measures, especially measures undertaken at the expense of Shindig.  As such, Good Times had no control over the operations of Shindig which was managed by its majority shareholder Manish Mallick.  The Consulting Agreement therefore is not a marketing plan.

-12-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

### 3. The Consulting Agreement Does Satisfy the FTC Franchise Rule.

Unable to properly allege that the Consulting Agreement is a franchise agreement, Shindig relies on an obscure rule promulgated by the Federal Trade Commission (the "FTC") the purported violation of which serves as the predicate act for Shindig's Fourth Claim for Relief for violation of the Unfair Competition Law, Business & Profession Code section 17200 et seq. (the "UCL"). In so doing, Shindig cites to a 43 year old federal regulation (44 Fed. Reg. at 49967) but omits discussion of an informal advisory opinion of the FTC interpreting the regulation. See Informal Staff Advisory Opinion 98-4 (the "FTC Opinion 98-4").

Specifically, FTC Opinion 98-4 states that a business relationship is subject to the FTC rule on franchises if it satisfies the elements of a franchise under 16 C.F.R. §436.2(a) (the FTC Rule"). Opinion 98-4 notes that to be subject by the FTC Rule,

> a business arrangement must also satisfy the three definitional elements of a "franchise"(1) set forth in the Rule: (1) the distribution of goods or services associated with the franchisor's trademark or trade name; (2) *significant control of, or significant assistance to, the franchisee*; and (3) a required payment of at least $500 within 6 months of signing an agreement.

FTC Opinion 98-4 (citing 16 C.F.R. § 436.2(a)(1)(i))(emphasis added).

> To constitute "significant," the "control" or "assistance," must be related to the franchisee's entire method of operation -- not its method of selling a specific product or products which represent a small part of the franchisee's business. *Controls or assistance directed to the sale of a specific product which have, at most, a marginal effect on a franchisee's method of operating the entire business will not be considered in determining whether control or assistance is "significant."*

FTC Opinion 98-4 (emphasis added).

> The opinion further states that the term "significance" *is a "function of the degree of reliance which franchisees are reasonably likely to place upon the controls or assistance."* Id. This is especially true of investors who are inexperienced in the particular business. The Commission addresses "significant control and assistance" *issues on a case-by-case basis.* Among other things, the Commission considers the nature of the particular industry, the level of sophistication of the investors, *as well as the meaning of the assistance and control to the investors*. Id.

FTC Opinion 98-4 (citing Statement of Basis and Purpose, 43 Fed. Reg. 59614, 59701 (December 21, 1978) (emphasis added). Finally, to constitute a franchise under the FTC

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-13-

1 Rule, there must be a payment of at least $500.00 by the franchisee of signing a franchise
2 agreement.  16 C.F.R §436.1(h)(3).
3       Here, the Amended Pleading does not allege that Shindig has paid the
4 management fee, license fee or any other fee to Good Times within six months of signing
5 the Consulting Agreement.  As such, Shindig has failed to allege a material element
6 under the FTC Rule.  Additionally, and as noted in section 1.D, Good Times has no
7 ability to control the decision making process of Shindig.  The managing member of
8 Shindig, Manish Mallick, is alleged to own 60% of the company, which is the controlling
9 interest in Shindig and the Consulting Agreement does not provide Good Times with the
10 right to control any decision of Shindig.  As such, Shindig does not meet the significant
11 control or assistance element and therefore the FTC Rule does not apply. Accordingly,
12 the Fourth Claim for Relief for violation of the UCL does not state facts upon which
13 relief can be granted for the reasons stated in sections 1, 2 and 3 above.

**4.  Shindig's Conduct of Signing the Operating Agreement and Consulting Agreement were Manifestly Unreasonable**

Shindig contends that it was duped into signing its own operating agreement.  The allegations of Shindig's execution of its operating agreement, however, are manifestly unreasonable.  Nowhere does Shindig allege that is manager member, Mallick read the document.  Nor does Shindig explain why Mallick signed a document was allegedly drafted by a person who was not a member of the Shindig and who allegedly represented to Shindig's managing member "not to worry about it."  Amended Pleading, ¶30.  Nor does Shindig explain why its managing member signed the Operating Agreement which appointed the wife of the drafter of the document, Vikram Bhambri, as a co-managing member rather than the wife of Manish Mallick. *Id.*, ¶34.  Indeed, when Mallick asked about this peculiarity, Mallick did nothing when allegedly told by Bhambri, "don't worry we will update it later and that we just need to get this signed so that we can move forward with the lease." Amended Pleading, ¶34.  This peculiarity is made more pronounced given that Shindig is alleged to have invested $700,000.00 in the buildout of

-14-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint

the restaurant (*Id.* ¶29) and the signatures were signed electronically, giving Mallick time to read a document that he does not allege he read and which identified on the sole signature page each and every member of Shindig.

The alleged circumstances surrounding the execution of the Consulting Agreement are even more unreasonable. In the original counterclaim, Shindig alleges that Mannick read the Consulting Agreement and noticed a management fee that had never been discussed. Counterclaim, ¶20. That allegation is now removed. Additionally, Shindig signed the consulting agreement notwithstanding the alleged representation of Vikram Bhambri that he structured the agreement to avoid being subject to franchise law. Amended Complaint, ¶25. And again, Bhambri is alleged to have told Mallick not to worry about peculiar terms in the agreement. *Id.*, ¶28. The conduct of Shindig and its manager is manifestly unreasonable because Shindig had information about material issues with the agreements or that Shindig's allegations are patently false or preposterous. Either way, the fraud exception to the parol evidence rule is properly waived given the alleged conduct of Shindig. *See Broberg v. Guardian Life Insurance,* 171 Cal. App. 4th 912, at 921-922 (2009).

**5.    Shindig's Claim for Breach of Fiduciary Duty is Properly Dismissed.**

Although Fed. Rule Civ. Pro. Permits Rule 8 permits a short and plain statement of a claim showing that Shindig is entitled to relief, the Amended Pleading fails to state a facially plausible claim for breach of fiduciary duty as required by *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S.C 662 (2009). The Amended Pleading does not allege the conduct under taken by the Third Party defendants that constitutes breach of fiduciary duty.

Dated: June 3, 2022

By: /s/ Edward Romero
David L. Jordan
Edward Romero
Attorneys for Plaintiff And Counter-Defendant and Third Party Defendants

-15-

Reply Memorandum in Support of Motion to Dismiss Amended Counterclaim and Third Party Complaint