

DAVID L. JORDAN (SBN 203457)
dljordan@grsm.com
EDWARD ROMERO (SBN 148495)
eromero@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 875-3323
Facsimile: (415) 986-8054

Attorneys for Plaintiff and Counter-Defendant
GOOD TIMES RESTAURANTS, LLC And
Third Party Defendants
VIKRAM BHAMBRI, ANUPAMA BHAMBRI;
TARESH ANAND; JATINDER PAL SINGH KOHLI;
And SACHIN DHAWAN

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GOOD TIMES RESTAURANTS, LLC, a California limited liability company,

Plaintiff,

v.

SHINDIG HOSPITALITY GROUP LLC, an Illinois limited liability company, et al.

Defendant.

SHINDIG HOSPITALITY GROUP LLC, an Illinois limited liability company,

Counter-Plaintiff,

v.

GOOD TIMES RESTAURANTS, LLC, a California limited liability company,

Counter-Defendant,

SHINDIG HOSPITALITY GROUP, LLC, an ILLINOIS limited liability company,

Third-Party Plaintiff,

v.

VIKRAM BHAMBRI, et al.

Third Party Defendants.

**Case No. 3:21-cv-07688 AGT**

**REPLY MEMORANDUM OF PLAINTIFF, COUNTER-DEFENDANTS AND THIRD PARTY DEFENDANTS TO MOTION TO DISMISS AMENDED COUNTERCLAIM OF SHINDIG HOSPITALITY GROUP, LLC**

Date: Friday, October 28, 2022
Time: 10:00 a.m.
Courtroom: A –15th Floor
[The Honorable Alex G. Tse]



Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

# TABLE OF CONTENTS

**Page**

1. This Motion is Timely. ....1

2. The Consulting and License Agreement is Not a Franchise Agreement. ....1

A. Shindig Fails to Allege That it Paid a Franchise Fee to Good Times. ....1

B. The Management Fee is Not a Fee for the Right of Shindig to Do Business. ....3

C. The Intellectual Property License is Not Alleged to be a Fee Paid by Shindig for the Right to do Business. ....4

D. The Amended Counterclaim Fails to Allege the Existence of a Marketing Plan or System Prescribed in "Substantial Part" by a Franchisor ....5

3. The Agreement is Not a Franchise Agreement under Illinois Law. ....8

4. The Fourth Claim for Relief for Violation of the California Unfair Competition Law is Properly Dismissed ....11

5. The Seventh Claim for Relief is Properly Dismissed Because Shindig's Conduct of Signing the Operating Agreement and Agreement were Manifestly Unreasonable. ....12

6. Shindig's Tenth Claim for Breach of Fiduciary Duty is Properly Dismissed. ....13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................ 2, 13

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007)........................................................................................ 2, 13

*Broberg v. Guardian Life Insurance*,
171 Cal. App. 4th 912 (2009) ............................................................................. 13

*Chicago Male Medical Clinic v. Ultimate Management, Inc.*,
2014 WL 7180549 (C.D. Cal. Dec. 16, 2014) .......................................... 8, 9, 10

*People v. Kline*,
110 Cal. App. 3d 587 (1980) ........................................................................ 6, 7, 8

*Salkeld v. V.R. Business Brokers*,
192 Ill. App. 3d 663 (Ill. App. Ct. 1989) ............................................................ 10

*Thueson v. U-Haul Internat, Inc.*,
144 Cal. App. 4th 664 (2006) ......................................................................... 1, 3, 5

*Wright–Moore Corp. v. Richo Corp.*,
908 F.2d 128 (7th Cir. 1990) .............................................................................. 5

**Statutes**

815 Illinois Compiled Statutes
Section 705/3 ........................................................................................... 2, 3, 9

Business & Professions Code
Section 10030 ........................................................................................................ 6

Business & Professions Code
Section 17200 ...................................................................................................... 11

Business & Professions Code
Section 20001 .................................................................................................. 2, 3

Business & Professions Code
Section 20007 ........................................................................................................ 3

Civil Code
Section 47 ............................................................................................................ 14

Corporations Code
Section 31005 ...................................................................................................... 1, 3

Corporations Code
Section 31011 ........................................................................................................ 3



Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**Rules**

Federal Rules if Civil Procedure
Rule 8 .......... 2, 13

Federal Rules of Civil Procedure
Rule 15 .......... 1

Federal Rules of Civil Procedure
Rule 7 .......... 1

**Treatises**

16 Code of Federal Regulations
Section 436.1 .......... 12

16 Code of Federal Regulations
Section 436.2 .......... 11

43 Code of Federal Regulations
Section 59614 .......... 12

43 Code of Federal Regulations
Section 59701 .......... 12

44 Code of Federal Regulations
Section 49967 .......... 11

**Regulations**

California Corporation Commissioner
Release 3-F, Rev. 6/22/94 .......... 3, 4, 5, 6

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**1. This Motion is Timely.**

As set forth in the Reply Memorandum of defendant and counter-defendant Good Times Restaurants, LLC ("Good Times") and the Third-Party Defendants, leave of court was neither needed nor requested to respond to the Second Amended Complaint in this action. Rather, the Second Amended Complaint was filed with leave of court to correct the allegations regarding jurisdiction. As such, Shindig had the right to file its answer to the Second Amended Complaint and did so. Moreover, Rule 7(a) of the Federal Rules of Civil Procedure do not identify a counterclaim as a pleading. As such, the time specified by Rule 15(a)(3) to respond to an amended pleading does not apply. To the extent Shindig contends that its "amended" counterclaim is a pleading because it is contained in its answer to the Second Amended Complaint, the time for Good Times to respond was 21 days after Shindig served its answer as permitted by Rule 15(a)(1)(B).

**2. The Consulting and License Agreement is Not a Franchise Agreement.**

The sole basis for Shindig's opposition to this motion is its contention that the Consulting and Licensing Agreement between it and Good Times (the "Agreement") constitutes a franchise agreement. Shindig, however, fails to address material issues raised by Good Times and the Third Party Defendant Vikram Bhambri in support of this motion.

*A. Shindig Fails to Allege That it Paid a Franchise Fee to Good Times.*

For the Agreement to constitute a franchise agreement, Shindig is required to have paid Good Times a fee for the right to do business. This allegation is an essential element to a claim that the Agreement is a franchise agreement. *Thueson v. U-Haul Internat, Inc.*, 144 Cal. App. 4th 664, 670 (2006)("a franchise is a contract or agreement, either express or implied, whether oral or written, by which (1) a franchisee is granted the right to engage in a marketing system substantially prescribed by the franchisor; (2) the business is substantially associated with the franchisor's trademark or other commercial symbol; and (3) the franchisee is required to pay a franchise fee."). *Id*. "Only when all components are present can a franchise actually be found to exist." *Thueson, supra*, at 670. *See also* California Corporations Code section 31005(a) of the California Franchise Investment Law the (the "CFIL") (requiring payment by a franchisee of at

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

least $100.00 for the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in "substantial part" by a franchisor); Business and Professions Code section 20001 of the "California Franchise Relations Act" (the "CFRA")(requiring payment by franchisee of at least $100.00 for the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in "substantial part" by a franchisor) and 815 ILCS 705/3(c) of the Illinois Franchise Disclosure Act (requiring the franchisee to pay the franchisor or its affiliate a franchise fee of $500.00 or more to engage in the business of offering, selling, or distributing goods or services under a marketing plaint or system prescribed or suggested, "in substantial part" by a franchisor).

The Amended Counterclaim fails to allege that Shindig paid any fee to Good Times for the right do business. This issue was raised by Good Times and Bhambri in their opening memorandum at 15:4-7. Shindig, however, fails to address this issue and the omission is fatal to its claims that the Agreement is a franchise agreement. Instead, Shindig asserts in its opposition that the Agreement requires Shindig to pay a franchise, suggesting that the purported obligation satisfies the condition that it actually pay a fee to Good Times. *See* Opposition at 8:9-14; 9:9-12. This assertion is not sufficient under either the CFIL, CFRA or the Illinois Franchise Disclosure Act for the Agreement to be a franchise agreement. Rather, the plain language of these statutes require Shindig to have actually paid a franchise fee to Good Time in order for the Agreement to be a franchise agreement. The Amended Counterclaim does not so allege nor can Shindig amend its counterclaim to allege this fact as it has never paid Good Times any monies owed under the Agreement and this is why Good Times brings its action.

In the absence of an allegation that Shindig paid a fee to Good Time for the right to do business, Shindig is unable to allege a short and plain statement showing that it is entitled to relief under its Second Claim for Relief for violation of the CFIA, Fifth Claim for Relief for wrongful termination under the CFRA and Sixth Claims for Relief for violation of the Illinois Franchise Disclosure Act, as required by Rule 8(a) of the Federal Rules of Civil Procedure, *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 556-557, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). As a consequence, this motion to dismiss is warranted because the

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Amended and Good Times and Bhambri respectfully request that this motion be granted.

*B. The Management Fee is Not a Fee for the Right of Shindig to Do Business.*

Not only has no fee been paid to Good Times, the management fee alleged in paragraph 26 of the Amended Counterclaim is not a franchise fee. A franchise fee is a fee or charge that a franchisee or subfranchisor "is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including, but not limited to, any payment for goods and services." *Thueson, supra*, at 670-671 (citing Cal. Corp. Code section 31011; Business & Prof. Code section 20007); see also Corporations Code section 31005(a); Business and Professions Code section 20001 and 815 ILCS 705/3(c) of the Illinois Franchise Disclosure Act. "Whether or not a fee or charge is " 'required' " and whether it is made " 'for the right to enter into a business,' " is considered a mixed question of fact and law." *Thueson* , supra, at 671-672 (citing Commissioner of Corporations guidelines for determining whether an agreement constitutes Franchise, Release 3-F, Rev. 6/22/94 (the "Guidelines")).

The management fee is not conditioned on the right of Shindig to do business as a restaurant. Nor does the Amended Counterclaim so allege. Nor could Shindig credibly do so because the management fee is consideration for the restaurant consulting services that Good Times is to provide Shindig under the Agreement. Moreover the management fee does affect Shindig's right to enter the restaurant business or operate a restaurant. Nor can Shindig credibly so allege because the scope of the consulting services set forth in paragraph 1 of the Agreement in no way affects the ability of Shindig to enter the restaurant business or to offer, sell or distribute goods or services.

In fact, the Amended Counterclaim makes clear that it was Shindig that is alleged to have opened its business without help from Good Times. Amended Complaint, ¶¶37, 38. Specifically, Shindig asserts that it:

• The managing member of Shindig "began taking steps to form [Shindig], scot a location to open the bar and restaurant, and generate the funds needed to finance the opening of the restaurant in Illinois. (Amended Counterclaim, ¶22);

• Invested approximately $700,000.00 in the buildout and opening of the restaurant (Amended Counterclaim, ¶29);

• Shindig executed a commercial lease for the property that would be used by Shindig (the "Property"). (Amended Counterclaim, ¶36.

• The managing member of Shindig spent significant time, money and energy preparing the Property to operate as a bar and restaurant without any assistance from Good Times or the other members of Shindig. (Amended Counterclaim, ¶37);

• Spent significant time, money and energy of its managing member, Manish Mallick, to prepare the property to operate as a bar and restaurant (Amended Counterclaim, ¶37) and

• Shindig was forced "to hire an experienced 'consultant' to learn how to operate a restaurant" and "design its own menu. (Amended Counterclaim, ¶55.)

In light of these allegations, Shindig may not credibly allege that the management fee is a fee for its right to do business as restaurant or to provide goods or services for a restaurant. The Agreement did not limit, restrict or impede Shindig's the ability to open its restaurant. Indeed, the Agreement did not grant Shindig the right to open a restaurant and is therefore not a franchise agreement. This point is made clear in the California Corporation Commissioner in Release 3-F ("Release 3-F") cited in the Opposition Memorandum at 6:23-7:11. In Release 3-F, the Commissioner has since 1974 opined that that "[i]f t*he agreement does not grant the franchisee the right to engage in business, it is not a franchise.*" Accordingly, in the absence of a fee paid for the right to do business, Shindig is not able to allege a claim upon which relief can be granted as to the Second, Fifth and Sixth Claims for Relief.

*C. The Intellectual Property License is Not Alleged to be a Fee Paid by Shindig for the Right to do Business.*

Shindig argues strenuously that $75,000.00 fee for the Intellectual Property License identified in paragraph 5 of the Agreement is a franchise fee. In so doing, Shindig fails to disclose that the Amended Counterclaim contains no allegation about the Intellectual Property License. Nor does the Amended Counterclaim allege that the fee for the Intellectual Property License is a franchise fee. Nor can Shindig credibly so allege as not only was no license fee ever



Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

paid by Shindig to Good Times, but the Intellectual Property License also does not confer a right on Shindig to do business as a restaurant. Rather, the license permits Shindig to use some of Good Times' intellectual property at the Shin restaurant.

That the Intellectual Property License fee is not a franchise fee is further made clear by Release 3-F. Under the section entitled "Required to Pay" the Commissioner opines that optional fees which a franchisee is not required to make are not franchise fees. As paragraph 7 of Release 3-F states:

> The Law does not include in the definition of "franchise fee" payments which the franchisee is not required to make but which are optional and required only if the franchisee elects to purchase, lease or rent merchandise, equipment or other property from the franchisor or an affiliate of the franchisor. *In the absence of an obligation or a condition in the franchise agreement compelling action on the franchisee's part, or the necessity for undertaking such obligation in order to successfully operate the business, voluntary payments are not "required" under the agreement and, therefore, are not included within the statutory definition of "franchise fee."*

Id.

The Intellectual Property License is therefore an ordinary business expense of Shindig. As the Court of Appeals in *Thueson* made clear: "[o]ur statutes define a franchise fee as a fee paid for the right to do business, not ordinary business expenses paid during the course of business." *Thueson v. U-Haul International, Inc., supra* at 676 (citing *Wright–Moore Corp. v. Richo Corp*., 908 F.2d 128, 136 (7th Cir. 1990)).

### *D. The Amended Counterclaim Fails to Allege the Existence of a Marketing Plan or System Prescribed in "Substantial Part" by a Franchisor*

Shindig asserts that paragraphs 2 and 5 of the Agreement constitute a marketing plan. See Opposition at 5:25-22. Shindig, however, fails to note that the Amended Counterclaim makes no allegations as to the existence of a marketing plan or system. Nor does the Amended Counterclaim allege that the Agreement constitutes a marketing plan that is in "substantial part" prescribed by a franchisor. Indeed, in the absence of a franchise fee paid by Shindig for the right to do business, Good Times is not a franchisor notwithstanding the assertions set forth in is opposition. This conclusion is supported by Release 3-F which states:

> [T]he *ability of the franchisor to control the essential decision making process of a franchisee's business, such as through a majority ownership interest in the business or by appointing a majority of the members of a committee* that is responsible for making

important decisions relating to sales, marketing, merchandising, personnel, etc., is indicative of a marketing plan prescribed by the franchisor.

As a consequence, the Agreement presents none of the indicia of a marketing plan identified by the Commissioner in Release 3-F.

Finally, Good Times has no ability to control the decision making process of Shindig. The managing member of Shindig, Manish Mallick, is alleged to own 60% of the company, which is the controlling interest in Shindig. Amended Counterclaim, Exhibit C at page 26, Schedule 4.1; Amended Counterclaim, ¶33. Moreover, the Agreement does not provide Good Times with the right to control any decision of Shindig. Indeed, Shindig is not required to agree or comply with any instruction, information or guidance provided by Good Times. This fact is made clear by the inability of Shindig to identify any provision in the Agreement which requires Shindig to hire undocumented workers or hire Good Times' chef and kitchen staff. See Amended Counterclaim, ¶¶42, 52.

Shindig's reliance on *People v. Kline*, 110 Cal. App. 3d 587, 591 (1980) is misplaced. *Kline* involved criminal defendant who appealed his misdemeanor conviction for unlawful offer and sale of securities and unlawful sale of a franchise. With respect to the franchise conviction, Appellant asserted that he sold two business opportunities to a partnership that consisted of two individual investors and that business opportunities do not meet the statutory definition of a franchise because, inter alia, there was no marketing plan. *People v. Kline*, *supra*, at 592-593.

In affirming the conviction for the unlawful sale of a franchise, the Court of Appeal noted that the investors signed a partnership agreement drafted by Appellant in which an investor agreed to invest $50,000.00 to purchase at least two kiosks for Aunt Hilda's Pennsylvania Dutch Steamed Franks. Appellant represented that these kiosks would be sold as franchises. *People v. Kline* at 591. The two investors also signed, as partners, a "purchase agreement" drafted by Appellant in which the partnership would purchase to Aunt Hilda's Kiosks' Business Opportunities. *Id.* at 591-592. The Court of Appeal expressed its doubt that the sale of the kiosks were "business opportunities" because section 10030 of the California Business and Professions Code defines the term "as the sale or lease 'of the business and good will of an





Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

existing business enterprise or opportunity." *Kline, supra*, at 594, note 3.

Addressing Appellant's contention that the absence of a marketing plan precluded his conviction for unlawful sale of a franchise, the Court of Appeal noted that a marketing plan can be either expressed or implied. The Court, however, found that there was "ample evidence from which the trial court could find all of the statutory elements of a franchise." *Kline*, *supra*, at 594. The Court of Appeal also noted the trial court's conclusion that "the whole atmosphere around this sale clearly related to the sale of other than just the kiosk. It was a sale, actually, of a franchise." *Id*. In so doing, the Court of Appeal examined the written contract between Appellant's company, National Food Service Marketing, Inc., which served as the franchisor, and the partnership formed by the investors and which comprised the franchisee. *Id*. at 594-595.

The contract bound the franchisor "to 'total and continuing support' of the franchisee." *Kline, supra*, at 594. Appellant further orally agreed, through National Food Servicing Marketing, Inc. "to assist in advertising and to supply food and supplies and menu planning, etc., through his corporation." As a result, the Court of Appeal found that:

> The use of identifiable and distinctive kiosks at least implied a prescribed marketing plan or system, and there was an expressed agreement to sell "Aunt Hilda's Pennsylvania Dutch Steamed Franks," surely an indication of a common marketing plan or system. Appellant also promised that there would be an operational plan which he had 'pretty well worked out.'

*People v. Kline*, *supra*, at 594.

Appellant also represented to a number of people that he was organizing a national food franchise similar to other well-known and successful national franchises. *Kline* at 594. As a result, the Court of Appeal concluded that:

> *the whole scheme was appellant's conception of an integrated operated prescribed and directed by him through National Food Service Marketing, Inc., his corporation.* By phrasing his handwritten agreement in terms of sale of a "business opportunity, appellant cannot avoid the requirement of registering this franchise sale.

*People v. Kline*, *supra*, at 594 (emphasis added).

The Court of Appeal therefore concluded that "[a] sale for a fee of a business substantially associated with the seller's trademark, service mark, trade name, logotype, advertising or other commercial symbol, *which the seller represents will constitute a franchise*

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

*and will include a marketing plan or system to be prescribed in substantial part by the seller* is the unlawful sale of an unregistered franchise." *People v. Kline* at 595 (emphasis added).

Neither Good Times nor Bhambri sold or offered to sell anything to Shindig. Rather, the Agreement addresses the consulting services to be performed by Good Times and provides Shindig with the option to license some of Good Times' intellectual property. The Agreement does not contain a marketing plan or system for the Shindig restaurant and the Amended Counterclaim does not so allege. While the licensing portion of the Agreement permits Shindig to use Good Times' "color scheme" and "look and feel," the Agreement does not require Shindig to use Good Times' intellectual property. Nor does the Agreement require Shindig to obtain approval from Good Time as to the location of the restaurant, its use of trade names, advertising, signs, sales pitches, or sources of supply. Nor does the Agreement require Shindig to report to Good Times about the conduct of the restaurant. Nor does the Agreement confer Good Times with the right to take corrective measures at the restaurant as the expense of Shindig. Finally, the terms of the Consulting Agreement bear no resemblance whatsoever to the facts in *People v. Kline*. As such, there is no express or implied marketing plan or scheme which is a material element of a franchise agreement under either the CFIL and the CFRA which Shindig acknowledges are virtually identical. Accordingly, the failure of Shindig to allege a marketing plan that is prescribed in substantial part by Good Times is therefore yet another defect in the Amended Counterclaim which prevents Shindig from alleging facts sufficient to state a claim upon which relief can be granted as to the Second, Fifth and Sixth Claims for Relief. Accordingly, Good Times respectfully requests that these claims be dismissed.

**3. The Agreement is Not a Franchise Agreement under Illinois Law.**

Shindig acknowledges that the Illinois Franchise Disclosure Act, is virtually identical to the CFIL and CFRA. Opposition Memorandum at 10:15-17. Shindig's reliance on *Chicago Male Medical Clinic v. Ultimate Management, Inc.*, 2014 WL 7180549 (C.D. Cal. Dec. 16, 2014) is misplaced. Plaintiff in *Chicago Male Medical Clinic* was an Illinois limited liability company that had its principal place of business in Illinois. *Id.* at *2. Defendant was a California Corporation with its principal place of business in California. *Id.* As part of a

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

consulting agreement between the parties, Plaintiff paid Defendant an initial fee of $300,000.00 for the right to "engage in the National Male Medical Clinic business" which consisted of erectile dysfunction and related medical services. *Chicago Male Medical Clinic, supra*, at *2-*3. The initial fee also included time payment fees of 10 percent of the daily gross revenue of plaintiff's clinic operations. *Id*. As part of the agreement, Defendant suggested a marketing plan which included "[t]elephone training for incoming calls, suggested newspaper, magazine, circular, and radio ads, text for effective window signing, information and aid in setting up toll free telephone numbers, call center services, and other suggested marketing plans." *Chicago Male Medical Clinic, supra*, at *3, *7.

Plaintiff brought a claim for violation of the IFDA seeking to rescind the agreement for failure to register the franchise with the State of Illinois or deliver a disclosure statement. *Chicago Male Medical* Clinic, *supra*, at *6.

The district court that heard the trial of the action found that the agreement was a franchise agreement because, inter *alia*, Plaintiff was required to pay a fee of more than $500.00 to Defendant for the right to engage in the National Male Medical Clinic business and because there was a marketing plan requiring Defendant in "conducting business." *Id*. at *6 and *8. In so doing, the district court noted that under the IFDA, a marketing plan is:

> a plan or system relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional material or cooperation in advertising efforts . . . .

*Chicago Male Medical Clinic, LLC, supra*, at *6 (citing 815 Ill Comp. Stat. 705/3(18)).

Here, Shindig did not purchase the right to enter the restaurant business or to offer, sell or distribute restaurant goods and services. Rather, the Agreement specified the services that Good Times would provide to Shindig as to an unspecified restaurant and the consideration to be paid by Good Times was for the performance of the consulting services. Additionally, the Agreement provided Shindig with right to license some of Good Times' intellectual property if Shindig so chose and set forth the consideration to be paid by Shindig for the use of such property. This is in contrast to the initial cash amount of $300,000.00 and 10 percent of daily gross revenues to be

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

paid by Plaintiff in Chicago Male Medical Clinic for the right to enter the erectile dysfunction and related medical services.

As set forth above, the Amended Counterclaim does not allege that Good Times provided Shindig with a plan or system relating to the specification of price or pricing system at the Shindig restaurant; use of particular sales or display equipment other than the license of certain intellectual property of Good Times. Nor does the Amended Counterclaim allege that Good Times provided Shindig with specific sales techniques to be used at the restaurant or the use of advertising or promotional material or cooperation in advertising efforts with respect to the restaurant. The facts of *Chicago Male Medical Clinic, LLC* are therefore distinguishable from those of this case.

*Salkeld v. V.R. Business Brokers*, 192 Ill. App. 3d 663 (Ill. App. Ct. 1989) is similarly distinguishable. Plaintiff in *Salkeld* responded to an advertisement to sell and distribute a new product called Cocktails Naturally. *Salkeld, supra*, at 1153. Plaintiff paid approximately $22,500 for the right to sell the product. *Id*. at 601. When the venture did not work out, Plaintiff brought an action under the IFDA which the opinion refers to as the "Franchise Act."

In reversing the trial court's finding that Plaintiff had not entered into a franchise agreement, the Appellate Court of Illinois examined the definition of "marketing plan" under the IFDA which consisted of the same language as cited in *Chicago Male Medical Clinic, LLC, supr*a. The Court in *Salkeld* found a marketing plan because:

> Plaintiff was provided a copy of a sales manual detailing product information and sales strategies. The manual stated how to demonstrate the product to potential customer [sic] and mix the drinks. Furthermore, plaintiff was given a document describing the 'sub-license program' as a program in which the company is 'with you [plaintiff] every step of the way.' *The company promised support in marketing, training, advertising and promotion.*

*Salkeld v. V.R. Business Brokers, supra,* at 599 (emphasis added).

Unlike the representations by the franchisor in *Salked*, Good Times did not promise to support to Shindig in the operation of a franchise. Rather, the Agreement provides that Good Times would be consulted on various matters related to the establishment and operation of a restaurant. The consultancy contemplated by the Agreement is therefore collaborative. Good

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

Times had no role in the conduct undertaken by Shindig at its restaurant nor did Good Times have the right to take corrective measures, especially measures undertaken at the expense of Shindig. As such, Good Times had no control over the operations of Shindig which was managed by its majority shareholder Manish Mallick. The Agreement therefore is not a marketing plan.

**4. The Fourth Claim for Relief for Violation of the California Unfair Competition Law is Properly Dismissed**

Unable to allege that the Agreement is a franchise agreement, Shindig relies on an obscure rule promulgated by the Federal Trade Commission (the "FTC") the purported violation of which serves as the predicate act for Shindig's Fourth Claim for Relief for violation of the Unfair Competition Law, Business & Profession Code section 17200 et seq. (the "UCL"). In so doing, Shindig cites to a 43 year old federal regulation (44 Fed. Reg. at 49967) but omits discussion of an informal advisory opinion of the FTC interpreting the regulation. See Informal Staff Advisory Opinion 98-4 (the "FTC Opinion 98-4").

Specifically, FTC Opinion 98-4 states that a business relationship is subject to the FTC rule on franchises if it satisfies the elements of a franchise under 16 C.F.R. §436.2(a) (the FTC Rule"). Opinion 98-4 notes that to be subject by the FTC Rule,

> a business arrangement must also satisfy the three definitional elements of a "franchise"(1) set forth in the Rule: (1) the distribution of goods or services associated with the franchisor's trademark or trade name; (2) *significant control of, or significant assistance to, the franchisee*; and (3) a required payment of at least $500 within 6 months of signing an agreement.

FTC Opinion 98-4 (citing 16 C.F.R. § 436.2(a)(1)(i))(emphasis added).

> To constitute "significant," the "control" or "assistance," must be related to the franchisee's entire method of operation -- not its method of selling a specific product or products which represent a small part of the franchisee's business. *Controls or assistance directed to the sale of a specific product which have, at most, a marginal effect on a franchisee's method of operating the entire business will not be considered in determining whether control or assistance is "significant."*

FTC Opinion 98-4 (emphasis added).

> The opinion further states that the term "significance" *is a "function of the degree of reliance which franchisees are reasonably likely to place upon the controls or assistance."* Id. This is especially true of investors who are inexperienced in the particular business. The Commission addresses "significant control and assistance" *issues on a case-by-case basis*. Among other things, the Commission considers the

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

> nature of the particular industry, the level of sophistication of the investors, *as well as the meaning of the assistance and control to the investors*. Id.

FTC Opinion 98-4 (citing Statement of Basis and Purpose, 43 Fed. Reg. 59614, 59701 (December 21, 1978) (emphasis added). Finally, to constitute a franchise under the FTC Rule, there must be a payment of at least $500.00 by the franchisee of signing a franchise agreement or the commitment to make such a payment. *See* 16 C.F.R §436.1(h)(3).

Here, the Amended Counterclaim does not allege that Shindig has paid the management fee, Intellectual Property License fee or any other fee to Good Times within six months of signing the Agreement. As such, Shindig has failed to allege a material element under the FTC Rule. Additionally, and as noted above, Good Times has no ability to control the decision making process of Shindig. The managing member of Shindig, Manish Mallick, is alleged to own 60% of the company, which is the controlling interest in Shindig and the Agreement does not provide Good Times with the right to control any decision of Shindig. As such, Shindig does not meet the significant control or assistance element FTC Opinion 98-4 and therefore the FTC Rule does not apply. Accordingly, the Fourth Claim for Relief for violation of the UCL does not state facts upon which relief can be granted for the reasons stated in sections 1, 2 and 3 above.

**5. The Seventh Claim for Relief is Properly Dismissed Because Shindig's Conduct of Signing the Operating Agreement and Agreement were Manifestly Unreasonable**

Shindig contends that it was duped into signing its own operating agreement. The allegations of Shindig's execution of this document, however, are manifestly unreasonable. Nowhere does Shindig allege that is manager member, Mallick read the document. Nor does Shindig explain why Mallick signed a document that was allegedly drafted by a person who was not a member of the Shindig and who allegedly represented to Shindig's managing member "not to worry about it." Amended Counterclaim, ¶30. Nor does Shindig explain why its managing member signed the Operating Agreement which appointed the wife of the drafter of the document, Vikram Bhambri, as a co-managing member rather than the wife of Manish Mallick. *Id.*, ¶34. Indeed, when Mallick asked about this peculiarity, he did nothing when allegedly told by Bhambri, "don't worry we will update it later and that we just need to get this signed so that

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

we can move forward with the lease." Amended Counterclaim ¶34. This peculiarity is made more pronounced given that Shindig is alleged to have invested $700,000.00 in the buildout of the restaurant (*Id*. ¶29) and the signatures were signed electronically, giving Mallick time to read a document that he does not allege he read and which identified on the signature page each and every member of Shindig.

The alleged circumstances surrounding the execution of the Agreement are even more unreasonable. In the original counterclaim, Shindig alleges that Mannick read the Agreement and noticed a management fee that had never been discussed. Counterclaim, ¶20. That allegation is now removed. Additionally, Shindig signed the Agreement notwithstanding the alleged representation of Bhambri that he structured the agreement *to avoid being subject to franchise compliance requirements.* Amended Complaint, ¶25 (emphasis added). And again, Bhambri is alleged to have told Mallick not to worry about peculiar terms in the agreement. *Id*., ¶28. The conduct of Shindig and its manager is manifestly unreasonable given that Shindig had information about material issues with the Agreement and Operating Agreement. As such, Shindig's allegations are patently false or preposterous. Either way, the fraud exception to the parol evidence rule is properly waived given the alleged conduct of Shindig. *See Broberg v. Guardian Life Insurance*, 171 Cal. App. 4th 912, at 921-922 (2009).

**6. Shindig's Tenth Claim for Breach of Fiduciary Duty is Properly Dismissed.**

Although Fed. Rule Civ. Pro. Permits Rule 8 permits a short and plain statement of a claim showing that Shindig is entitled to relief, the Amended Counterclaim fails to state a facially plausible claim for breach of fiduciary duty as required by *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S.C 662 (2009). The Amended Counterclaim does not allege the conduct under taken by the Third Party defendants that constitutes breach of fiduciary duty. Nor does the Amended Counterclaim state which disputed terms the Third Party defendants are alleged to have inserted into the Agreement in breach of their fiduciary duty to Shindig. See Amended Counterclaim at ¶116. Indeed, if the Agreement contained terms that were disputed or which breach fiduciary duties to Shindig, why did its managing member, Mallick, sign the Agreement ostensibly breach his fiduciary duty to Shindig too? Indeed,

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

nowhere in its opposition does Shindig address the fact that the Agreement is signed by the Managing Members of Shindig and Good Times and not by the Third Party Defendants other than the Bhambris. Finally, the assertion that the Third Party defendants breached their fiduciary duty to Shindig by authorizing this lawsuit ignores the existence of the litigation privilege of Civil Code section 47, an issue that Shindig also does not address. Accordingly, the Tenth Claim for Relief is properly dismissed because the Amended Counterclaim fails to state a claim upon which relief can be granted.

Dated: September 20, 2022

GORDON REES SCULLY MANSUKHANI, LLP

By: ______________________
David L. Jordan
Edward Romero
Attorneys for Plaintiff And Counter-Defendant GOOD TIMES RESTAURANTS, LLC And Third Party Defendants VIKRAM BHAMBRI, ANUPAMA BHAMBRI; TARESH ANAND; JATINDER PAL SINGH KOHLI; and SACHIN DHAWAN